WALTER L. BARRELL & another *vs.* WILLIAM A. PAINE & others.

Suffolk.    March 28, 29, 1922. — July 6, 1922.

Present: RUGG, C. J., BRALEY, DE COURCY, CROSBY, & JENNEY, JJ.

*Wagering Contract.    Stockholder.    Stock Exchange.    Evidence,* Competency.
*Conflict of Laws.    Contract,* Validity, Performance and breach.

St. 1919, c. 247, amending R. L. c. 99, § 4, has no application to "odd lot" trans-
actions in securities which are not shown to be purchases or sales to be received
or delivered by "direction of the clearing house" of "a stock exchange or
board of trade," although it appears that the business of "odd lot" brokers
is in effect similar to that of a clearing house.

In an action against a stockbroker under R. L. c. 99, it appeared that a finding
for the plaintiff was warranted unless the defendant brought himself within
the defence provided by § 4 by proving actual purchases and sales of securities
ordered by the plaintiff to be bought and sold from time to time. At the trial
it appeared that the transactions were in stocks in blocks of less than one
hundred shares, called "odd lots," and that the plaintiff's orders to the de-
fendant were carried out through the employment of "odd lot" brokers, and,
upon the evidence, findings were warranted that, as a witness for the defendant
testified, the "odd lot" purchases and sales were "delivered by paying the broker
at the end of the day the difference in cash, which saves us drawing numerous
number of checks and instead of passing numerous certificates, the purchases
and sales are offset;" that the process of adjustment was mere bookkeeping; that
the defendant made no actual purchases and sales of the stocks ordered by the
plaintiff to be bought, sold and carried on margin, and that the defendant's
correspondents or agents from the first transaction to the last did not have
a sufficient number of shares in their possession or control to satisfy the de-
mands of all their customers. *Held,* that a finding was warranted that the
defendant had not made out a defence under § 4 of the statute.

At the trial of an action against a stockbroker under R. L. c. 99, where the entire
detailed account of the plaintiff with the defendant as it appeared on the
defendant's books, extending over a period from August, 1915, to April, 1917,
was annexed to a report of an auditor in evidence, a clerk of the defendant,
who had testified that he "had charge of the accounts of various customers
having particular reference to the state of their account, its value, etc." and
that he had investigated the situation as to the plaintiff's account on May 9,
1916, which, according to a finding of the auditor, was the day before the plain-
tiff had begun gambling transactions, may be allowed further to testify as to the
amount of the balance of the account in the plaintiff's favor if from the value
of the stocks the defendant then was "carrying" for the plaintiff the amount
which the plaintiff then owed the defendant was deducted.

One, who in Boston had with a Boston stockbroker dealings of the character
described in G. L. c. 137, is entitled to recover under that statute although the
stockbrokers carried out the transactions through their agents in New York.

At the trial of an action against a stockbroker under R. L. c. 99, the defendant contended that under § 4 of the statute he was not liable because all transactions on behalf of the plaintiff were carried out by means of actual purchases or sales. It appeared that the defendant had with ninety per cent of his customers an agreement that he might make use of any stock that he was carrying for them, and that he at all times had on hand sufficient stock to satisfy the demands of all customers other than those who had made such an agreement with him. The plaintiff had made no such agreement. *Held,* that the existence of such agreements with others did not affect the rights of the plaintiff under the statute.

An auditor, to whom was referred an action against a stockbroker under R. L. c. 99, found that the plaintiff, who had had an account with the defendant beginning in August, 1915, "without any such definite idea as to" the nature of the transactions that he could be said to have an affirmative intention that there should be no actual transactions, by the following May 10 "was obviously gambling on the market," and that, "beginning with that date he had an affirmative intention that there should be no actual transactions of purchase and sale and that the defendant had reasonable cause to believe that he had that intent. . . . The transactions in which I find that he had the intent . . . began before his original purchases had all been sold and his original margin was used in part on account of these transactions. I find that the transactions in which the intent that there should not be actual purchases and sales existed are sufficiently numerous to taint the entire account." There was evidence that on May 9 the value of securities owned by the plaintiff and held by the defendant exceeded the amount owed to the defendant by the plaintiff by $400, that thereafter he paid the defendant in the transactions $300 and that the defendant received as dividends on securities of the plaintiff which he held the sum of $10.50. Other transactions preceding May 10, if found to be within the statute, would have warranted a finding for the plaintiff in the sum of $1,735.45. Evidence warranted a finding that a defence under § 4 of the statute was not made out. There was a finding for the plaintiff in the sum of $710.50 with interest from the date of the writ. *Held,* that the finding by the judge, based on transactions after May 10, was warranted.

CONTRACT upon an account annexed stating transactions of the plaintiffs, husband and wife, with the defendant, a firm of stockbrokers. Writ dated April 23, 1917.

The account annexed was as follows:

| | | | | |
|---|---|---|---|---|
| (1) 1915, | Aug. | 17, | To cash paid | $400.00 |
| (2) | " | 19, | " " " | 100.00 |
| (3) | " | 21, | " " " | 100.00 |
| (4) | Sep. | 1, | To dividend on 20 Studebaker | 25.00 |
| (5) | " | 30, | To cash paid | 500.00 |
| (6) | Dec. | 1, | To dividend on 20 Studebaker | 50.00 |
| (7) | " | 28, | To cash paid | 5165.00 |
| (8) 1916, | Jan. | 1, | To cash paid | 5860.00 |
| (9) | " | 17, | Dividend on 5 N. Y. Transit | 20.00 |
| (10) | " | 31, | To dividend on 2 Prairie Oil & Gas | 6.00 |
| (11) | " | " | To dividend on 5 Prairie Pipe Line | 25.00 |

| (12) 1916 Mch. | 1, | To dividend on 22 Studebaker | $55.00 |
|---|---|---|---|
| (13)     Apr. | 24, | To 12 Canadian Pac. Delivered | 1982.52 |
| (14)     "    " | | To 2 D. L. & W.          " | 441.92 |
| (15)     May | 2, | To cash paid | 110.00 |
| (16)     " | 20, | To cash paid | 200.00 |
| (17)     " | 23, | "      "      " | 100.00 |
| (18)     June | 1, | " dividend on 2 Studebaker, com. | 5.00 |
| (19) 1917, Jan. | 5, | To dividend on 11 Shoe, com. | 5.50 |
| (20) | | Total | $15,150.94 |

The plaintiffs waived their claims as set out in items 7, 8, 13 and 14.

The action was referred to an auditor. Material findings of the auditor were as follows:

An account with the defendants first was opened on August 17, 1915, in the name of the plaintiff Walter L. Barrell only. On December 14 that account "was transferred to the joint names of W. L. Barrell and A. C. Barrell, the two plaintiffs. At that time the account showed a substantial equity in favor of the plaintiffs, and at about that time the defendants' agent in charge of the Copley Plaza office [in Boston] had recommended by telephone to Mrs. Barrell that Mr. Barrell should sell and take his profit."

Annexed to the auditor's report was a copy of the entire accounts as they were carried on the defendants' books in detail from August 17, 1915, to April 1, 1917.

The auditor specifically found "that Mr. Barrell began his transactions with the defendants in August, 1915, without any such definite idea as to their nature that he could be said to have an affirmative intention that there should be no actual transactions, but by May 10 he was obviously gambling on the market, and I find that beginning with that date he had an affirmative intention that there should be no actual transactions of purchase and sale and that the defendants had reasonable cause to believe that he had that intent. I find that the early payments in the summer and fall of 1915, amounting to $1,100, were paid generally upon account and that he made the purchases of March and April without further margin. There was nothing to indicate that the March and April transactions differed in nature from those of August and September. The transactions in which I find that he had the intent that there should be no actual pur-

chases and sales began before his original purchases had all been sold and his original margin was used in part on account of these transactions. I find that the transactions in which the intent that there should not be actual purchases and sales existed are sufficiently numerous to taint the entire account. . . .

"The defendants have pleaded the statutory defence that they made actual purchases and sales and are therefore not liable to the plaintiffs under R. L. c. 99. . . .

"All of the plaintiffs' transactions except the final transaction . . . were in stocks principally traded in in New York and therefore were executed there by the defendants. It is further to be noted that all the plaintiffs' transactions with the defendants were orders for the purchase or sale of less than one hundred shares of a particular stock at a given time. Such transactions are called in the trade transactions in 'odd lots' and are not executed through the stock exchange clearing house either in New York or Boston. Ordinarily they are executed by actual delivery of certificates from the selling broker to the buying broker and payment therefor by check. In large offices like that of the defendants this is the practice even when the same number of shares of the same stock are sold to and bought from another broker on the same day. This is because in a business as large as that conducted by the defendants the deliveries on sales are carried out by different clerks from those who draw the checks. If the defendants were temporarily without certificates of the requisite denominations and of the required stock it might happen that a certificate so received would be returned to the same broker it came from. There is no evidence that in any instance in this case there was not a physical delivery of a certificate for the stock bought or sold within the time thereafter permitted by the custom of the business, and I find as a fact that subsequent to each order by the plaintiffs for a purchase or sale which the defendants reported to the plaintiffs had been executed by them (that is within twenty-four hours except that sales made the day before a holiday were completed the day after the holiday and sales on Friday or Saturday were completed Monday), a certificate for the corresponding number of shares in that stock was delivered by or to the defendants to or from some other stockbroker and a check received for the price of the stock. I further find that

at all times thereafter during the period covered by the trans-
actions with the plaintiffs, the defendants had on hand or under
their control shares in the stocks they purported to be carrying
for the plaintiffs equal in number to those to which the plaintiffs
were entitled.

"It appeared, however, that both the defendants and their
correspondent New York brokers, during the period covered by
the plaintiffs' transactions with the defendants, were at various
intervals and in substantial amounts 'short' of the stocks which
they purported to be carrying for the plaintiffs in the sense that
on balancing up their books for the day a balance of such stocks
sufficient to meet the demands of all customers then on their
books was obtained only by including in the account kept by the
defendants to show their resources in such stocks, stocks owed the
defendants by other brokers and stocks owed the defendants by
other customers for whom the defendants had executed 'short'
sales; that is, sales of stocks which the customers did not intend
immediately to deliver to the defendants for transfer, such as
some of the transactions of the plaintiffs with the defendants
after May 1, 1916. . . .  [A detailed statement of such trans-
actions was annexed to the auditor's report] . . .

"I find, if it is within my province so to find, that balances so
arrived at were so frequent and in such quantities as to charac-
terize the account and indicate a usual course of business of the
defendants and [New York correspondents].  Upon the under-
standing that as a matter of law short sales of other customers
cannot be set off against orders for purchases so as to strike a
balance as above described in proving the defence of actual pur-
chases and sales under the above statute, upon the foregoing facts
I find, if it is an issue of fact which it is within my province to
pass upon, that the defendants did not make actual purchases
and sales of the stocks they were ordered by the plaintiffs to buy
and sell and carry on margin for the plaintiffs. . . ."

Evidence as to the law of New York was introduced before
the auditor and described by him.  He reported: "It seems fair
to assume that if there were any decisions of the courts of New
York defining what is meant by 'actual purchases and sales' in
such cases they would have been put in evidence.  None of the
above cases define it even by way of dictum.  In the absence of

some expression of judicial opinion on this point, I am not convinced that the courts of New York ultimately will hold. that it is an actual purchase or sale by a broker in execution of a margin contract therefor when upon the completion of such execution as he makes, without any setting apart or appropriation of specific shares to the customer, his supply of the stock in question is insufficient to fulfill his obligations to deliver to all customers to whom he owes that stock. He is then guilty of conversion, under the New York decisions, of the shares of all his other customers in that stock and if his new purchases were deemed an actual purchase for the new customer, yet he would immediately become guilty of conversion of the stock of this newest customer as well. One would naturally assume that the addition to his supply should be appropriated to the pre-existing obligation to his other customers rather than the newer obligation in the absence of specific appropriation of certificates. I therefore find that the defendants have not sustained their burden of establishing that on this point the law of New York differs from that of Massachusetts.

"Whether a subsequent conversion of all the shares of all the customers in this particular stock, including that of the newest customer, makes unreal an initial transaction which would otherwise be actual, is a more difficult question. On this I accept the testimony of the witness and find that under the law of New York a purchase or sale which was executed by delivery and payment at the time of the order by a broker not then or thereby made short is an actual purchase or sale in spite of the fact that the broker by subsequently becoming short of the stock violates his obligation to carry and is guilty of a conversion of that stock and of the stock of all other like customers.

"Whether a transaction which is regarded as an actual purchase or sale under the laws of New York, where it occurs, but would not be so regarded in this State is the defence intended by R. L. c. 99, § 6, is a question of law and not within my province to decide.

"The defendants put in evidence a form of agreement allowing the use without notice by brokers of customers' stocks. There was evidence that this was signed by all marginal customers of . . . [the defendants' New York correspondents] and by some of the defendants' customers, but it did not appear how many cus-

tomers of the defendants signed it and I find that neither of the plaintiffs signed it."

The action first was heard in the Superior Court by *Raymond, J.,* without a jury, who found for the plaintiffs in the sum of $1,941.41, and exceptions saved by the defendants were sustained by this court in a decision reported in 236 Mass. 157.

The action then was heard by *McLaughlin, J.,* without a jury. The auditor's report was in evidence and also testimony of one Leonard D. Draper, a partner in the defendants' firm and manager of their Boston office, and of one D. Henry Childs, a clerk of the defendants.

Draper testified as follows, explaining the sale or purchase of shares in lots of less than one hundred shares on the New York Stock Exchange: "If we have orders to buy or sell an odd lot, that is, anything under one hundred shares and which are not cleared by the New York clearing house, they are given to what we call the 'odd lot' brokers on the floor of the New York Stock Exchange. These brokers made a specialty of dealing solely in off lots. They are members of the stock exchange. If we have an order to purchase, say, ten shares, the order is given to the odd lot broker. We will say ten shares at the market. The order is given to the odd lot broker, and when there is a sale made on the New York Stock Exchange he sells those shares to us at one eighth above the market, above the last quotation, and on a sale it is just the reverse. He buys it of us at one eighth under the next sale which is made on the stock exchange. These are delivered by paying the broker at the end of the day the difference in cash, which saves us drawing numerous number of checks and instead of passing numerous certificates, the purchases and sales are offset. That is, if we should buy seventy shares of one stock and sell fifty shares of the same, he would deliver us twenty shares or certificates. If we bought fifty shares and did not sell any, he would deliver us fifty shares."

Draper further testified that the defendants' customers signed a form of agreement or order allowing the use by the defendants of any stock that they might be carrying for them. This agreement or order was obtained because there was a statute in New York forbidding the use of the certificates by brokers unless such an order was received. He testified that approximately ninety per cent of their customers had signed these so called agreements,

and that at all times during the period that Barrell was trading with the defendants they had enough stock on hand to deliver to their customers who had not signed such a consent or waiver.

As to the testimony of the witness Childs, the record recited: "By agreement, the testimony of D. Henry Childs, who testified at the former trial, was admitted. His testimony was as follows: That he was a clerk for Paine, Webber and Company and had charge of the accounts of various customers having particular reference to the state of their account, its value, etc.; that he had investigated the situation with regard to the Barrell account as it stood on the books on May 9, 1916. He then testified, subject to the plaintiffs' objection, that if one took the value of the stocks which we were carrying for them and deducted the amount which they owed us, the balance in the plaintiffs' favor was approximately $400. The plaintiffs duly alleged and saved their exception to the admission of the foregoing evidence."

At the request of the defendants, the judge ruled as follows:

"4. The transactions from August 17, 1915, to May 10, 1916, were entered into with intent that there should be actual purchases and sales and were therefore not within G. L. c. 137 [R. L. c. 99].

"5. No recovery can be had for margins paid in prior to May 10, 1916.

"6. The earlier good transactions and the later transactions held by the auditor to be within the statute are not inextricably interwoven so that the good cannot be separated from the bad, but are clearly separable and easily divided as of May 10. All transactions which occurred on or before that date are clear and good. The plaintiffs had no right of action on that day. No changing of intention by the plaintiffs on May 10 can pollute or taint the already completed transactions so as to give the plaintiffs a right to recover for moneys previously deposited but practically eliminated by losses before that date."

The judge also granted a request by the defendant for a ruling numbered 7 that "No recovery can be had for more than the cash value of the account as it stood on May 10 or $400 plus cash deposited thereafter of $300," after adding, "and the additional sums of $5 received by the defendants June 1, 1916, as dividend on two shares of Studebaker, and $5.50 received January 5, 1917,

as dividend on eleven shares of United Shoe Machinery common."

The judge also ruled that the business of odd lot brokers was, in effect, similar to the duties of a clearing house, but refused to rule that such sales should be treated as if they were made by direction of the clearing house of the New York Stock Exchange.

The judge also refused to rule that the agreements of the defendants with ninety per cent of their customers relating to use by the defendants of the securities of those customers affected the rights of the plaintiffs under R. L. c. 99; or that the transactions through the "odd lot" brokers were actual and legal within the amendment to the gaming statute, St. 1919, c. 247, § 1, or that the transactions in question were governed by the laws of New York.

The judge also refused the following rulings asked for by the defendants:

"21. As a matter of law the finding must be for the defendants.

"22. On all the evidence the finding must be for the defendants."

The judge on November 1, 1921, found for the plaintiffs in the sum of $903.26, which, according to his rulings upon the defendants' requests numbered 4, 5 and 6, and 7 as modified, was the sum of $400, the value of the equity of the plaintiffs' account when, as the auditor found, Barrell began his gambling transactions, plus items 16, 17, 18 and 19 of the account annexed to the declaration, a total sum of $710.50, to which was added interest from the date of the writ to the date of the finding.

Both the plaintiffs and the defendants alleged exceptions and, at their request and by agreement between them, the judge reported the action to this court for determination upon the following terms:

"1. If, upon all the evidence in the case, as a matter of law, the defendants' requests 21 and 22 should have been given, then judgment is to be entered for the defendants;

"2. If the defendants' requests 21 and 22 were properly refused, but any of the defendants' other requests which were refused should have been given and materially affected the finding of the court, then a new trial is to be ordered;

"3. If, upon all the evidence properly admitted in the case, a finding for the plaintiffs was warranted, and if, upon all the evidence, as a matter of law, the plaintiffs were entitled to recover

as damages the amount found by the auditor, then a finding is to be entered for the plaintiffs for that amount; otherwise, judgment is to be entered for the plaintiffs in the amount found by the Superior Court."

*W. R. Bigelow,* for the plaintiffs.

*W. P. Evarts,* for the defendants.

BRALEY, J. The defendants' first contention is that St. 1919, c. 247, amending R. L. c. 99, § 4, under which the case at bar is brought, defeats the plaintiffs' right of recovery. But, even if the amendatory act, passed after the transactions in question had been completed, is to be read with the original statute, *Wilson* v. *Head,* 184 Mass. 515, the evidence does not show that the "odd lot" transactions, to which we shall later refer, were purchases, or sales, to be received or delivered by the defendants by "direction of the clearing house" of "a stock exchange or board of trade." The defendants therefore fail to bring themselves within the amendment.

It is unnecessary to restate the grounds of alleged liability which are fully set forth in *Barrell* v. *Paine,* 236 Mass. 157, when the case was first before us. It was there held that under the finding of the auditor, "that at all times . . . during the period covered by the transactions with the plaintiffs, the defendants had on hand or under their control shares in the stocks they purported to be carrying for the plaintiffs equal in number to those to which the plaintiffs were entitled," the exceptions of the defendants must be sustained and a new trial ordered. At the second trial the report was again put in evidence supplemented by the answers of the defendants to interrogatories propounded by the plaintiffs, and the evidence of Leonard D. Draper, one of the defendants. It could be found that the plaintiffs intended there should be no actual purchase and sale of the stocks and that the defendants knew of and participated in their intention, and the parties are at issue over the question whether on the record the judge was warranted in finding there were no actual purchases and sales of the stock ordered to be bought and sold from time to time by the plaintiffs.

The judge as we have said not only had before him the auditor's report, but also the answers to interrogatories, and Draper's evidence. In substance the defendants admitted that there was no

physical delivery of a certificate for each share purchased and sold on the orders of the plaintiffs. The defendant Draper testified, and the judge could find, that the "odd lot" purchases and sales, each lot being less than one hundred shares, in which the plaintiffs ·and defendants dealt, "are delivered by paying the broker at the end of the day the difference in cash which saves us drawing numerous number of checks and instead of passing numerous certificates, the purchases and sales are offset." The process of adjustment was mere bookkeeping. The schedule of "Balances Received and Delivered" shows each day the transactions of that day with the odd lot brokers, and the first transaction of May 10, 1916, is the only one in which a certificate was delivered for the total number of shares of the daily transactions. The judge on all the evidence also could find, that the defendants made no actual purchases and sales of the stocks ordered by the plaintiffs ·to be bought, sold and carried on margin, and that the defendants' correspondents or agents from the first transaction to the last, and until the stocks were bought in or sold on the orders of the plaintiffs did not have a sufficient number of shares in their possession or control to satisfy the demands of all their customers. We perceive no error in the admission of evidence nor in the refusal of the defendants' requests for rulings numbered 21 and 22. It follows on the present record that a further finding was warranted, that the defendants had not proved, that "an actual purchase or sale of said securities" had ever been made or contemplated by ·the parties. R. L. c. 99, § 4.

The defendants did business in Boston where the plaintiffs dealt with them, and, even if the alleged purchases and sales were made through the defendants' agent or agents in New York, the plaintiffs are within the protection of our laws under which their rights are to be ascertained and established. *American Malting Co.* v. *Souther Brewing Co.* 194 Mass. 89. *Bearse* v. *McLean,* 199 Mass. 242. See *Fiske* v. *Doucette,* 206 Mass. 275, 285. The law of New York moreover was a question of fact. *Electric Welding Co. Ltd.* v. *Prince,* 200 Mass. 386. It does not appear that the courts of that State have ever been asked to determine the meaning and application of the words "actual purchase or sale" found in R. L. c. 94, § 4. But on the evidence introduced by the plaintiffs a wagering contract in the purchase and sale of stocks

on margin would be held invalid at common law.  *Bellegarde* v.
*Union Bag & Paper Co.* 90 App. D. (N. Y.) 577, affirmed, 181
N. Y. 519.  *Leonard* v. *Columbia Steam Navigation Co.* 84 N. Y.
48.  See *Beers* v. *Wardwell,* 198 Mass. 236, 239, and cases cited.

The agreement of some of the defendants' customers that the
defendants' agent in New York might apply stock held for delivery,
to satisfy the orders of other customers, was not binding upon the
plaintiffs who were not parties to it.  If the doctrine of set-off is
thus invoked it is not applicable.  "It is not that purchases and
sales cannot be properly set off against each other; it is rather that
the set-off cannot be a real one unless the opposite transactions
that are so set off are themselves real ones, have really been made
and carried out."  *Greene* v. *Corey,* 210 Mass. 536, 548.

The defendants' requests in so far as not given were denied
rightly.  *Matthys* v. *Hornblower,* 224 Mass. 248, 252.  *Adams*
v. *Dick,* 226 Mass. 46.  *Zembler* v. *Fitzgerald,* 234 Mass. 236, and
kindred cases are very plainly distinguishable.

The plaintiffs however contend that the finding in their favor
should have been for $1,735.45, the amount found by the auditor,
instead of $903.26 as found by the judge.  But, even if the auditor
treated the account opened by the plaintiffs, who are husband
and wife, as a continuation of a previous account of the husband
individually, the judge properly could determine as a question of
fact that the first account had been substantially adjusted and
closed before the plaintiffs jointly entered into the relation of
customer and broker, and that the two accounts had been treated
by the parties as separate and distinct; and the computation by
the judge based upon the finding of the auditor that the gambling
transactions began on May 10, 1916, was justified by the evidence.

By the terms of the report judgment for the plaintiffs is to be
entered on the finding.

*So ordered.*