Michael P. GRACE, II and Fatima Charities, Inc., Plaintiffs,

v.

M. Eli LIVINGSTONE, Defendant.

Civ. A. No. 60-803.

United States District Court
D. Massachusetts.

July 11, 1961.

Joseph P. Rooney, Boston, Mass., for plaintiffs.

Harry Sacher, New York City, for defendant.

WYZANSKI, District Judge.

This is a diversity jurisdiction case sounding in contract, in which the parties waived a jury. Action is brought to recover sums claimed to be owing from defendant, a stock dealer, because of his failure promptly to honor his obligation to pay sums due upon plaintiffs' exercises of what are called "puts", that is, options held by plaintiffs, as customers, and entitling them to require defendant, as principal, to purchase specified securities at agreed prices.

Plaintiff Grace is a citizen of New York. Plaintiff Fatima Charities, Inc., is a New Jersey corporation. Defendant Livingstone is a citizen of Massachusetts conducting, under the name Livingstone & Company, an investment and brokerage business in Massachusetts.

About October 27, 1954, upon the advice of his counsel, Simons, Grace, in order to accomplish certain tax savings, decided to have stock market transactions, centering on a put, with a Boston dealer, Livingstone. Pursuant to oral discussions in New York, Grace planned to buy from Livingstone $1,050,000, face value, Appalachian Electric Power Company, 3⅛% bonds, Series 1977, with coupons payable June 1 and December 1 each year, at $1,105 (or, as it is usually stated in the trade, at 110½) per bond, subject to a put at $1,085 (or 108½). It was Grace's, not Livingstone's, understanding that the put would be available for 6 months. When the agreement was reduced to writing, probably in New York on October 27, 1954, it took the form of Ex. 2, a letter, from Livingstone to Grace, conforming to Grace's plan, except that the put was stated to be available only until December 8, 1954.

To meet the amount due Livingstone, Grace paid him $118,762.98 out of his own funds and $1,055,250 which he borrowed from Guaranty Trust Co. In this borrowing, Grace executed his note to the Guaranty, at a 3% interest rate, and pledged the bonds he had just bought, and also, with Livingstone's consent, pledged approximately $99,000 of Livingstone's securities.

December 1, Appalachian paid its coupon interest to Guaranty, and Guaranty remitted the same to Grace.

The market in Appalachian having dropped in the meantime, Grace and Livingstone met at least twice in December 1954. Grace said he had understood that in October Livingstone was giving him a put valid for 6 months. Livingstone denied this, but agreed under certain circumstances, recited hereafter, to revive the put.

Livingstone agreed (1) to pay the Guaranty $1,055,250, the principal amount of that trust company's loan to Grace, together with accrued interest of $2,811.70 due from Grace, (2) to lend to Grace the total of these two amounts, at the same 3% interest, upon the security of Grace's Appalachian bonds, (3) to give Grace a put at 108½ effective through July 1, 1955 (Ex. 7), (4) to make this put assignable, and (5) to date the put back to October 27, 1954 by substituting Ex. 3 for Ex. 2.

In exchange, (1) Grace agreed that Livingstone should have the return of his own $99,000 worth of securities and (2) Grace executed Ex. 8 reciting that he did "hereby loan $1,050,000 Appalachian Electric Power, 3⅛% of 1977, on call, in return for your payment of my obligation to Guaranty Trust Co."

This exchange of promises was made in New York. But Ex. 3 and Ex. 7

which recite the put were typed on the Boston stationery of Livingstone & Co., whereas Ex. 8 which recites the loan on call was on Grace's New York stationery.

Pursuant to his right to assign, Grace on June 28, 1955 assigned to Fatima Charities, Inc., all his right to $500,000 Appalachian bonds, with accrued interest, "subject to any existing indebtedness thereon, such bonds now being loaned on call to Livingstone & Company \* \* \* together with my right to exercise an irrevocable option granted me by Livingstone & Company to sell said bonds to Livingstone & Co. at any time or times through July 1, 1955, at 108½." Ex. 11a.

June 28, 1955 from New York Grace wrote to Livingstone in Boston a letter stating: "I hereby exercise the said right contained in your said letter of October 27, 1954 and hereby require you to purchase $300,000.00 principal amount of such bond at 108½". On the same day, from the same address, Fatima Charities, Inc., wrote a similar letter.

As his only reply to Grace and Fatima, Livingstone sent to Grace a letter, dated June 29, 1955 (Ex. 13.). First, it enclosed, 29 days after the coupon date, the June 1 interest of $16,406.25 on the Appalachian bonds. Then it enclosed (1) what are called "confirmations of purchase" of $300,000 Appalachian bonds for Grace, and $500,000 Appalachian bonds for Fatima, and (2) letters "for signature authorizing us to purchase these securities and to satisfy the existing lien." Also Livingstone reminded Grace that, on account of his assignment of the previous day to Fatima, he needed, under tax laws, $250 worth of documentary stamps.

Neither Grace nor Fatima replied in writing, or approved the confirmations, or signed the proposed letters. Following oral discussions, letters from counsel, and unsuccessful efforts to adjust the matter, Grace and Fatima sued defendant, by complaint filed October 26, 1960.

This case is plainly within the diversity jurisdiction of this Court. 28 U.S.C. § 1332(a).

It does not appear to matter whether the law of Massachusetts or of New York be applied, as there is no discernible difference of consequence. However, there are many reasons for concluding that, were the choice significant, the law of Massachusetts would govern validity of, interpretation of, and rights and damages under the contract. Marshall v. James, 252 Mass. 306, 310, 147 N.E. 740; Barrell v. Paine, 242 Mass. 415, 425, 136 N.E. 414; cf. the 1960 amendments to Restatement of the Law, Second, Conflict of Laws, §§ 332b, 334e. Compare § 346m.

 Although the parties met in New York, the principal documents setting forth the obligation of defendant on which this case is premised, Exs. 3 and 7, were executed by him in Massachusetts. Here is his only place of business. Here it was that he conducted his activities as a dealer, that is, as a principal in all the transactions in this case. None involved him as a broker on a distant exchange. Here is the place to which plaintiffs would address their communications. Here is where the parties could be expected to make any requisite tenders or deliveries. Here, indeed, is the place of every contemplated performance. The aforesaid Massachusetts connections of this contract far outweigh in significance the New York residence of Grace, the New York locale of the oral negotiations, the New York provenance of Grace's letters, especially Ex. 8, and the uses which Grace and Livingstone made of New York banks for pledges of bonds and which Livingstone made of a New York short buyer. *In the silence of the parties,* Massachusetts law governs for reasons well explained in the notes accompanying the April 22, 1960 amendments to the Second Restatement of Conflict of Laws, Tentative Draft No. 6. Moreover, the Massachusetts rule subjecting a customer-broker relationship to Massachusetts law applies *a fortiori* to a customer-dealer relationship, where the contemplation of a New York market has only tertiary or even more remote bearing.

The contract upon which these plaintiffs found their claims was made in December 1955. It was not set forth in one document, but it was one contract. All the pertinent parts were integrated in Exs. 3, 7, and 8. In them there is no ambiguity. Hence no parol evidence is admissible. And if it were it would show no variance.

By Exs. 3 and 7 defendant committed himself to purchase at market, on any day through July 1, 1955, $1,050,000 face value Appalachian bonds at 108½ at the option of Grace or his assignees. And, fairly construed, the option was made assignable, in whole or in part, by Grace.

If Exs. 3 and 7 stood alone, it would be clear that because the bonds were delivered in December 1954 by Guaranty to Livingstone or his nominee, all that would be incumbent upon Grace or his assignee would be to notify Livingstone that the option was being exercised.

■ ■ No tender would be required because the bonds had been transferred in advance to Livingstone. Nor would it be requisite to offer to pay principal or interest to Livingstone on account of the loan he had made on these bonds. Cf. Donovan v. Draper, 268 Mass. 555, 560, 168 N.E. 91. Without additional specific authorization, he had the right to satisfy the debt for principal and interest, and the lien to secure them, by deducting the appropriate amount from the proceeds. Ibid. The amounts of deduction had been fixed by the contract. The formula was mathematical and certain. Immediate action was imperative, first so that the customer would not run the risk of a fluctuating market, and second so that interest on the loan would not accumulate.

If one were to recognize a dealer's right to stall on transactions where he has given a "put" until such time as the dealer and the customer were in complete agreement with respect to every item of charges and every lien, the consequence would be to place a clog upon the prompt and effective disposition of securities and the immediate execution of "puts" and other stock market transactions. This would be an intolerable way of handling affairs in a market as volatile as a securities exchange. Every day's delay, indeed every minute's delay, involves a gamble. And while men may if they choose speculate at their own convenience, they have no right to interfere with others' speculations by delay in carrying out orders clearly and properly given.

■ But Livingstone contends that what would be clear if Exs. 3 and 7 stood alone is modified by Ex. 8. The argument is that Grace did not pledge the bonds to Livingstone, but on the contrary did "loan" them "on call." Livingstone interprets this language as though Grace, for Grace's own benefit, authorized Livingstone to use the bonds in short sales, or otherwise, and thus created a situation in which if Grace needed bonds for his put he would have to buy them and himself pay a broker's commission to procure them. That interpretation finds no support in the language of the contract, in the surrounding circumstances, or in the proven practices of the trade. What the language, viewed objectively, says, and what the understanding of the parties, viewed subjectively, embraced, was an agreement by Grace authorizing Livingstone, for Livingstone's own benefit, to borrow the bonds, and to use them in Livingstone's own interest, subject to the right of Grace, without paying commissions or the like, to call for them or their equivalent from Livingstone, and subject to the duty of Livingstone to call or buy them or their equivalent, at his own expense, if expense there be, from any third party. Cf. Provost v. U. S., 269 U.S. 443, 454, 46 S. Ct. 152, 70 L.Ed. 352. Grace could call whenever he liked. Ibid. He could call *instanter*. Of course, deliveries of securities might take time, but obligations were crystallized as of the moment of the put and call. And, no doubt, Grace had no right to make a call except in connection with a put, and then only to the extent of the put.

■ In short, a customer has made a valid tender to a dealer when he has

transferred the securities in question to the broker, whether outright, by way of pledge, or by way of loan. In each situation, when the customer calls upon the dealer for performance, the leader is authorized forthwith to apply to the customer's order the securities theretofore transferred to him.

■ Next Livingstone contends that the letters from Grace and Fatima were inadequate because inelegant. Livingstone's argument is that the plaintiffs should have written him that they exercised their put, that they directed Livingstone from the proceeds to deduct all principal and interest due, and that they laid claim to payment of the balance. But when a customer exercises an option he need not recite that the dealer has a right to set off amounts to which by law the dealer is entitled.

Livingstone also suggests that if he had made the deductions to which he was entitled Grace would have protested. The theory is that months after June 1955 Grace claimed that he had never agreed to pay 3% interest on the loan Livingstone made to him. But while it is true that Grace did make this claim later, nonetheless, he did not make it in June. Livingstone did not *then* suppose that on this point the parties were in disagreement. And there is no evidence that as of that date they were in' disagreement, or that the obligations of each party to the other were not fixed by agreed formula and so readily calculable as to constitute liquidated cross-debts.

[8] In his letter of June 29 Livingstone mentioned the absence of documentary stamps for the assignment of the bonds on June 28 by Grace to Fatima, not, let it be observed, on the tender by Grace to Livingstone. We may assume that Grace should have purchased documentary stamps for the bonds he assigned to Fatima, and that Grace and Fatima should have purchased documentary stamps for the bonds each put to Livingstone. We may, more doubtfully, assume that the tenders to Livingstone were ob-jectionable on that account. But Livingstone raised no objection to the invalidity of the tender on that ground. Commissioner of Banks v. Chase Sec. Corp., 298 Mass. 285, 334, 10 N.E.2d 472. And the objection, in any event, would have been readily curable by Livingstone, who could have applied *pro tanto* the money he owed under the puts to pay for the documentary stamps on the bonds sought to be transferred to him.

This Court need have little patience with this argument coming as an afterthought from a dealer who kept from June 1, 1955 to June 29, 1955 the amount due his customer on account of interest payable on June 1 coupons, and who in calculations submitted to this Court (see defendant's brief p. 10) and earlier in calculations submitted to his customer, gave the customer credit for interest on his bonds only to June 28, 1955, but charged him interest on money lent to the customer to June 30, 1955.

■ Having once validly exercised their options, plaintiffs were, of course, under no duty to reply to defendant's letter of June 29, 1955 and its enclosures. They were entitled to stand firm on their rights.

Plaintiffs are entitled to prevail and to recover exactly what their brief claims. Each is entitled to receive an amount calculated as follows: each is to be credited with the value of the bonds he or it mentioned in the letters of June 28, 1955, and to be debited with a proportionate share of (a) the principal of the loan taken over by Livingstone from Guaranty, (b) the interest Livingstone paid Guaranty, together with (c) 3% interest on both sums from the date of the take over to June 29, 1955. On the balance thus achieved, plaintiffs are entitled to interest at 6% from June 29, 1955 to the date of judgment in this case. Winchell v. Plywood Corp., 324 Mass. 171, 181, 85 N.E.2d 313.

Judgment for plaintiffs to be drawn by them in accordance with this opinion.