PROVOST et al. *v.* UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 258.   Argued November 18, 1925.—Decided January 4, 1926.

1. Transfers involved in the " lending " of stock and " return " of the stock " borrowed," on the New York Stock Exchange, are taxable transfers, within the meaning of provisions of the Revenue Acts of 1917, and 1918, imposing a stamp tax of two cents per share upon " all sales or agreements to sell, or memoranda of sales or deliveries of, or transfers of legal title to shares or certificates of stock." P. 456.

2. Under the rules and practice of the New York Stock Exchange, a broker requiring certificates of stock to deliver in consummation of a short sale, may " borrow " them for that purpose from another broker as follows: The " borrower " deposits with the

"lender" their full market price; and, until the loan is returned, this deposit is maintained, by daily payments back and forth between the borrower and the lender, at the level of the market value of the borrowed stock; the lender usually pays interest on the deposit, but whether interest is paid or the borrower pays a premium for the "loan" of the shares, may be matters of agreement between them; the borrower contracts to give the lender while the loan continues, all the benefits, (such as dividends,) and the lender contracts to bear all the burdens, (such as assessments,) incident to the ownership of the shares, as though the lender had retained ownership of them; concurrently with the receipt of the deposit, the lender delivers to the borrower or for his account, the certificates of the stock lent. The stock borrowed thus becomes available to the borrower for delivery upon his short sale. Upon demand of either broker, their mutual obligations may be satisfied by a "return" to the lender of the stock borrowed—i. e. of the same kind and amount of shares, which the borrower purchases, borrows, cr otherwise procures for the purpose—and by repayment of the deposit to the borrower with interest, as agreed. *Held:*

(1) That, upon the physical delivery of the certificates by the lender, with full recognition of the right and authority of the borrower to appropriate them to his short sale contract, and their receipt by the purchaser, all the incidents of ownership of the stock borrowed pass to the latter. P. 456.

(2) The borrower, in that event, is neither a pledgee, trustee nor bailee for the lender; nor is the transaction within the meaning of a proviso in the above cited statutes, exempting from the tax, deposits of stock certificates as security for money loaned. *Id.*

(3) The "return" of the borrowed stock transfers to the lender all the incidents of ownership in the shares represented by the certificates delivered to him. *Id.*

(4) Consequently both the "loan" and the "return" transactions are within the terms of the above taxing statutes as "transfers of legal title to shares of stock." *Id.*

(5) And deliveries of indorsed certificates of stock incidental to these transfers, are "deliveries of . . . shares or certificates of stock" within the statutory provision. *Id.*

3. The reënactment of a taxing provision, after it has been construed by the Attorney General and the construction has been adopted by the Treasury Department and called to the attention of Congress, indicates a purpose to continue the law in force as so construed. P. 457.

4. When Congress in reënacting a provision, rejects a proposed alteration, a subsequent amendment incorporating it evinces a purpose to effect a change in the law.   P. 458.

60 Ct. Cls. 49, affirmed.

APPEAL from a judgment of the Court of Claims, for the United States, in a suit to recover, as an illegally exacted tax, the cost of revenue stamps affixed to "tickets" constituting documentary evidence of "loans" of shares of stock and return of shares "borrowed," in transactions between brokers on the New York Stock Exchange.

Mr. Charles E. Hughes, with whom Messrs. George W. Wickersham, William F. Unger, Samuel P. Gilman and Samuel Rubin were on the brief, for appellants.

I. The history of similar legislation indicates clearly that it was not the intent of Congress to tax the borrowing and return of stock among brokers.

Earlier taxing acts, similar in language and purpose, were held not to apply to such transactions.

The reënactment in the 1918 Act of the stamp tax provisions of the 1917 Act, does not indicate a ratification by Congress of the Treasury Department's ruling.

The Revenue Act of 1921 contains an express declaration disapproving the Treasury Department's interpretation of the 1917 and 1918 Acts.

II. There is no ground for inferring that Congress intended to discriminate against short sales or to impose a greater tax on "short" than on "long" transactions, nor is there any ground for assuming that Congress knew of the practice of brokers to borrow and return stocks in connection with short sales and intended to tax such borrowing and return.

III. The transactions involved in this claim are not taxable under the enacting clauses of the 1917 and 1918 Acts.

The word "deliveries" as used in the 1917 and 1918 Acts cannot be held to apply to every transfer of physical possession. It must be construed in the light of its context, and limited to sales and other similar transfers of legal title. *Holy Trinity Church* v. *United States,* 143 U. S. 457; *Virginia* v. *Tennessee,* 148 U. S. 503; *People* v. *New York & Manhattan Beach Ry.,* 84 N. Y. 565; *United States* v. *Standard Brewery, Inc.,* 251 U. S. 210; 2 Sutherland, Statutory Construction 2nd Ed. p. 707; *Mackall* v. *District of Columbia,* 16 App. D. C., 301; *Isitt* v. *Beeston,* L. R., 4 Exch. 159; *Cotton* v. *James,* 1 Moody & Malkin 273.

The lending of stock as practiced by brokers, does not constitute a transfer of legal title. The relation between the lending broker and borrowing broker is that of pledgor and pledgee. The transaction being a pledge, there is no transfer of title. *McNeil* v. *The Tenth National Bank,* 46 N. Y. 325; *Knox* v. *Eden Musee Co.,* 148 N. Y. 441; *First National Bank* v. *Lanier,* 11 Wall. 369; *National Safe Deposit Savings & Trust Co.* v. *Hibbs,* 229 U. S. 391.

Under the foregoing authorities, the title which a purchaser obtains from the borrowing broker is not based upon a prior transfer of title to the borrowing broker, but is based upon an estoppel created against the lending broker—an estoppel which bars him from asserting his title. "Title by estoppel" by its very terms indicates that it is not a true title predicated upon an unbroken chain of legal title, but that it is based upon a transfer by a person who has not acquired legal title. The ability of the borrowing broker to transfer to his purchaser a better title than he himself has, is not peculiar to the transactions involved in this case. The situation in this respect is no different from that of a broker holding stocks belonging to his customer, either as margin or merely for safekeeping. It has been held repeatedly that, although title to the stocks is in the customer, and not in the broker,

whether or not the broker has a lien thereon, the broker may, nevertheless, transfer good title thereto to an innocent purchaser for value. In both cases, from the legal standpoint, title to securities in the possession of one may be vested in the other and yet the one holding possession is able to transfer title to a third person. A sale has been defined by this Court as " a transfer of property for a fixed price in money or its equivalent." *Iowa* v. *McFarland,* 110 U. S. 471. Can it be said that these two elements, to wit: a transfer of property or title and the payment of a price, or either of them, are present in the case of the transfer of a certificate of stock by one broker to another for the purposes indicated in this claim? No price is paid by the borrowing broker to the lending broker and the transaction, therefore, cannot be denominated a sale, whatever else it may be. Nor can we conceive of any logical explanation which could harmonize the hypothesis that the transaction is a sale with the fact that the lending broker pays interest upon the money which he receives at the time the stock is delivered and the fact that he continues to receive the benefit of any dividends and other increase of the stock, and conversely, continues to be liable for any assessments or other charges against the stock. Nor can such theory be harmonized with the fact that the lending broker gains the benefit of any increase in the market value and likewise bears any loss which may result from a decline in such market value.

Neither is the transaction a gift or trust. *Chambers* v. *McCreery,* 98 Fed. (affirmed 106 Fed. 364). The borrowing of stock, from the facts disclosed, is nearer to a bailment than any of the other forms of transfer which we have yet enumerated. Three elements are said to be necessary to constitute a contract or pledge, viz: (1) The possession of the pledged property must pass from the pledgor to the pledgee or to some one for him; (2) The legal title to the pledged property must remain in the

pledgor; (3) The pledgee must have a lien on the property for the payment of a debt or performance of an obligation due him by the pledgor or some other person. An analysis of the methods by which stocks are "loaned" shows that all those various elements are present which are necessary to constitute the transaction a pledge as distinguished from the various other forms of transfer. One possible objection may be made here, viz., that a pledgee has no right to part with possession of the pledged property. Apart from the right of a pledgee of stocks to part with their possession, it is legally possible for such a pledgee to transfer good title thereto to a purchaser for value. It is firmly settled that a pledgee of stock is not required to retain in his possession the identical certificates of stock pledged with him. Such certificates are interchangeable, and the rights of the pledgor are not infringed by the transfer by the pledgee of the certificates of stock pledged. The status of the pledge is maintained so long as the pledgee has in his possession or under his control, a similar amount of similar stock. It is by virtue of this rule, peculiar to pledges of corporate stocks and bonds, that the borrowing broker not only is legally able to transfer good title to an innocent purchaser, but is enabled to do so without violating any of the rights of the lending broker and without being guilty of conversion. *Richardson* v. *Shaw,* 209 U. S. 365; *Skiff* v. *Stoddard,* 63 Conn. 216. By reason of the peculiar nature of a certificate of stock, the fact that the borrower of the stock may dispose of it and pass good title thereto is in no way repugnant to the transaction being a pledge of the stock. *Atkins* v. *Gamble,* 42 Cal. 86; *Douglas* v. *Carpenter,* 17 App. Div. 329; *Caswell* v. *Putnam,* 120 N. Y. 153. By the system of mark-ups and mark-downs which has been described in the stipulation of facts, the lending broker is fully protected with respect to the borrowing broker's performance, for the lending broker at all times holds an

amount of money equivalent to the market value of the securities. Because of this system, which protects each broker from loss by reason of default of the other, litigation is practically avoided and so the decisions are silent as to the liabilities of the respective parties in the event of a default on either part.

The opinion of the Attorney General, (31 Op. A. G. 225) upon which Treasury Decision 2685 was based, was rendered without a complete understanding of the facts and was based upon an erroneous assumption of the facts and a misapprehension of the law applicable to the transactions in question.

IV. The lending of stock is equivalent to the deposit of stock as collateral security for money loaned thereon, and is, therefore, exempt from tax under the first proviso of Paragraph 4 of Schedule A.

*Mr. Alfred A. Wheat,* Special Assistant to the Attorney General, with whom *Solicitor General Mitchell* was on the brief, for the United States.

MR. JUSTICE STONE delivered the opinion of the Court.

The appellants are co-partners engaged in business as stock brokers with membership in the New York Stock Exchange. They brought suit in the Court of Claims to recover, as an illegally exacted tax, the cost of internal revenue stamps affixed by them in the period from 1917 to 1920 to " tickets " which were documentary evidence of transactions commonly known in the stock-brokerage business as the " loan " of shares of stock and the return by the borrower to the lender of shares of stock " borrowed." The case was tried upon agreed facts embodied in the findings of the court below, and from the judgment for the defendant in that court the case was brought here on appeal. Jud. Code, § 242, before amendment of 1925.

The applicable provisions of the statutes are to be found in War Revenue Act of 1917, Title VIII, Schedule A, par. 4, 40 Stat. 300, 322, which is printed in the margin * and in the similar provision of the Revenue Act of 1918, Title XI, Schedule A, par. 4, 40 Stat. 1057, 1135, which may, for the purposes of this case, be taken to be a re-enactment of the 1917 provision.  Both acts imposed a stamp tax of two cents per share upon " all sales or agreements to sell, or memoranda of sales or deliveries of, or transfers of legal title to shares or certificates of stock."  The question presented is whether the transfers of shares of corporate stock involved in the " loan " and " return " transactions in accordance with the rules and practice of the Stock Exchange, are taxable transfers within the meaning of the statute.

The loan of stock is usually, though not necessarily, incidental to a " short sale."  As the phrase indicates, a short sale is a contract for the sale of shares which the

---

* Act of Oct. 3, 1917, c. 63, Title VIII, Schedule A, Paragraph 4, 40 Stat. 300, 322.

" 4. Capital stock, sales or transfers: On all sales, or agreements to sell, or memoranda of sales or deliveries of, or transfers of legal title to shares or certificates of stock in any association, company, or corporation,  .  .  .   whether made upon or shown by the books of the association, company, or corporation, or by any assignment in blank, or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale, whether entitling the holder in any manner to the benefit of such stock or not, on each $100 of face value or fraction thereof, 2 cents, and where such shares of stock are without par value, the tax shall be 2 cents on the transfer or sale or agreement to sell on each share, unless the actual value thereof is in excess of $100 per share, in which case the tax shall be 2 cents on each $100 of actual value or fraction thereof: *Provided,* That it is not intended by this title to impose a tax upon an agreement evidencing a deposit of stock certificates as collateral security for money loaned thereon, which stock certificates are not actually sold, nor upon such stock certificates so deposited: *Provided further,* That the tax shall not be imposed upon deliveries or transfers to a broker for sale, nor upon deliveries or transfers by a broker to a customer for whom and upon whose order he has purchased same,

seller does not own or the certificates for which are not within his control so as to be available for delivery at the time when, under the rules of the Exchange, delivery must be made.   Under the rules of the New York Stock Exchange, applicable so far as the facts of this case are concerned, a broker who sells stock is required to make delivery of the certificates on the next business day.   If he does not have them available, he must procure them for the purpose of making delivery.   This he may do by purchasing or borrowing the required shares, delivery of the certificates to be made to the broker to whom he has already contracted to sell.

If he borrows them, he deposits with the lending broker their full market price; and until the loan is returned, this deposit is maintained, by means of daily payments back and forth between the borrower and the lender, at the varying level of the market value of the shares loaned.

---

but such deliveries or transfers shall be accompanied by a certificate setting forth the facts: *Provided further,* That in case of sale where the evidence of transfer is shown only by the books of the company the stamp shall be placed upon such books; and where the change of ownership is by transfer of the certificate the stamp shall be placed upon the certificate; and in cases of an agreement to sell or where the transfer is by delivery of the certificate assign d in blank there shall be made and delivered by the seller to the buyer a bill or memorandum of such sale, to which the stamp shall be affixed; and every bill or memorandum of sale or agreement to sell before mentioned shall show the date thereof, the name of the seller, the amount of the sale, and the matter or things to which it refers.   Any person or persons liable to pay the tax as herein provided, or anyone who acts in the matter as agent or broker for such person or persons who shall make any such sale, or who shall in pursuance of any such sale deliver any stock or evidence of the sale of any stock or bill or memorandum thereof, as herein required, without having the proper stamps affixed thereto with intent to evade the foregoing provisions shall be deemed guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not exceeding $1,000 or be imprisoned not more than six months, or both, at the discretion of the court."

The lender, who thus receives in money the full market value of the shares—much more than he would ordinarily realize by pledging them—usually pays interest on the money so received, at the current rate for demand loans. But the rate of interest is a matter of negotiation and agreement, and the deposit may, on occasion, carry no interest, or the borrower of the stock may pay a premium when the stock is greatly in demand.

During the continuance of the loan the borrowing broker is bound by the loan contract to give the lender all the benefits and the lender is bound to assume all the burdens incident to ownership of the stock which is the subject of the transaction, as though the lender had retained the stock. The borrower must accordingly credit the lender with the amount of any dividends paid upon the stock while the loan continues and the lender must assume or pay to the borrower the amount of any assessments upon the stock. The lender of the stock, concurrently with the receipt of the deposit, delivers to the borrower the certificates of the stock lent, and the transaction is evidenced by a " loan ticket," to which the broker lending the stock affixes the revenue stamps here in question. The stock thus borrowed then becomes available for delivery on the short sale.

The original short sale is thus completed and there remains only the obligation of the borrowing broker, terminable on demand, either by the borrower or the lender, to return the stock borrowed on repayment to him of his cash deposit, and the obligation of the lender to repay the deposit, with interest as agreed. The stock for this purpose, if not provided by the customer, must be obtained by borrowing stock of like kind and amount from other brokers, or by purchasing the stock in the open market and charging the customer for whose account the sale was originally made, with the purchase price. In that case the short sale transaction and the borrowing

transaction as well are brought to their conclusion by the actual purchase of stock of which the customer was short at the time when the sale was made and the delivery of the stock, thus purchased, to the lender.\* The return transaction in every case is evidenced by a "borrowed stock return ticket" to which the borrowing broker affixes the revenue stamps. The claim of the appellants comprises the cost of stamps purchased by them and affixed to loan tickets or to borrowed stock return tickets pursuant to Treasury regulations.

It will be observed that the completed short sale transaction usually involves four separate steps in each of which there is either a sale or a complete transfer of all the legal elements of ownership. These are (1) the sale of the stock by the person effecting the short sale, followed by the transfer and delivery of the certificates for the borrowed stock to the purchaser's broker; (2) the transfer of the shares from the lender to the borrower, who uses them for delivery on the customer's short sale; (3) the purchase by the borrowing broker of the stock required to repay the loan; and (4) the transfer and delivery by the borrower to the lender of the certificates for the purchased shares to replace the shares borrowed. Each transfer may be accompanied by a physical delivery of certificates of the stock transferred; but the intermediate deliveries in (2) and (3) are usually eliminated by use of the Stock Exchange Clearing House.

It is conceded that the first and third transactions are taxable as "sales" or "agreements to sell" within the

---

\* In practice on the New York Stock Exchange, deliveries on sales and on stock loaned and returned, evidenced by loan tickets and borrowed stock returned tickets, are usually cleared on balance through the Stock Exchange Clearing House, so that the certificates pass directly from the lender to the purchaser on the short sale when stock is borrowed, and from the seller to the lender when borrowed stock is returned.

meaning of the statute; but it is contended that the second and fourth are not subject to the tax, because they involve neither a transfer of the legal title to the stock loaned and returned, nor "deliveries" of the shares or certificates representing them within the meaning of the Acts of 1917 and 1918, and that taking into account the history and purposes of the two statutes, it was not intended to include these transactions among the taxable transfers described.

On the argument it was also earnestly urged that the lender of stock is in a position analogous to that of a pledgor of the stock which he lends; that in consequence there is no transfer of title to the stock within the meaning of the taxing provisions of the two acts, and that in any event the lender is in the position of a borrower of money and the transaction falls within the proviso of the acts exempting from the tax, deposits of stock certificates as collateral security for money loaned.

These arguments ignore the essential legal characteristics of the loan transaction. It may be agreed for the purpose of this discussion, as was argued at the bar, that it is the law of many jurisdictions, including New York, where these transactions occurred, that the relation of the customer and the broker with whom the customer deposits stock as security for advances, or who purchases securities for account of the customer, is technically that of pledgor and pledgee, with authority and power on the part of the broker to repledge to the extent of his advances. See *Richardson* v. *Shaw*, 209 U. S. 365, 374; *Gorman* v. *Littlefield*, 229 U. S. 19; *Duel* v. *Hollins*, 241 U. S. 523; *Skiff* v. *Stoddard*, 63 Conn. 198; *Markham* v. *Jaudon*, 41 N. Y. 235; *Lawrence* v. *Maxwell*, 53 N. Y. 19; *Taussig* v. *Hart*, 58 N. Y. 425; *Caswell* v. *Putnam*, 120 N. Y. 153. But that view of their legal relationship finds support in the agreement between the customer and the broker which contemplates, as the law requires, that the

broker should at all times have on hand specific securities
for delivery to the customer on payment of the amount of
the broker's advances for the customer's account.
Although the broker has an implied authority to substi-
tute other securities of the same kind and amount for the
securities which he holds for his customer, and to repledge
them to the extent of his advances, courts have not dis-
pensed with the requirement that he should at least have,
either in his own possession or lodged with his bank on
the repledge, specific securities of the kind and amount
purchased for his customer, available for delivery to the
customer on payment of the balance due. *Richardson* v.
*Shaw, supra; Skiff* v. *Stoddard, supra; Taussig* v. *Hart,
supra; Lawrence* v. *Maxwell, supra; Caswell* v. *Putnam,
supra;* see *Carlisle* v. *Norris*, 215 N. Y. 400. For breach
of this duty he is liable, under the law of New York, for
conversion (*Markham* v. *Jaudon, supra; Lawrence* v.
*Maxwell, supra; Taussig* v. *Hart, supra; Mayer* v. *Monzo*,
221 N. Y. 442) and guilty of a criminal offense. N. Y.
Penal Law, § 956.

But the borrower of stock holds nothing for account of
the lender. The procedure adopted and the obligations
incurred in effecting a loan of stock and its delivery upon
a short sale neither contemplate nor admit of the reten-
tion by either the borrower or the lender of any of the
incidents of ownership in the stock loaned. The seller,
having contracted to sell securities which he does not own,
is under the necessity of acquiring dominion over stock
of the kind and amount which he has sold, with unre-
stricted power of disposition of it in order that he may
fulfill his contract. Whether his broker acquires the stock
by purchase or by giving to the lender of it the market
value of the stock plus his personal obligation to acquire
and return to the lender, on demand, a like kind and
amount of stock, the legal effect of the transfer is the
same. Upon the physical delivery of the certificates of

stock by the lender, with the full recognition of the right and authority of the borrower to appropriate them to his short sale contract, and their receipt by the purchaser, all the incidents of ownership in the stock pass to him.

When the transaction is thus completed, neither the lender nor the borrower retains any interest in the stock which is the subject matter of the transaction and which has passed to and become the property of the purchaser. Neither the borrower nor the lender has the status of a stockholder of the corporation whose stock was dealt in, nor any legal relationship to it. Unlike the pledgee of stock who must have specific stock available for the pledgor on payment of his loan, the borrower of stock has no interest in the stock nor the right to demand it from any other. For that reason he can be neither a pledgee, trustee nor bailee for the lender, and he is not one " with whom stock has been deposited as collateral security for money loaned." For the incidents of ownership, the lender has substituted the personal obligation, wholly contractual, of the borrower to restore him, on demand, to the economic position in which he would have been, as owner of the stock, had the loan transaction not been entered into.

When the borrower returns the borrowed stock, he acquires it by purchase or by borrowing again and in the process acquires and transfers to the lender all the incidents of legal ownership in securities which neither possessed before.

We therefore conclude that both the loan of stock and the return of borrowed stock involve " transfers of legal title to shares of stock " within the express terms of the statute; and while we are not called upon to define or enumerate the precise conditions which must attend the delivery of a certificate of stock, under other circumstances, to bring it within the taxing provisions of the Act, we think it clear that deliveries of indorsed cer-

tificates of stock, incidental to these transfers of legal title, are " deliveries of  . . .  shares or certificates of stock " within the language of the statute.

It follows that the borrowing of stock and the return of borrowed stock are both subject to the tax unless there is to be found in the legislation now under consideration or in its history, a purpose sufficiently definite and controlling to exclude the transactions in question from the operation of its applicable language.

In earlier revenue legislation, the Act of 1898 (30 Stat. 448, 458) and the Act of 1914 (38 Stat. 745, 759), a stamp tax was imposed on " all sales or agreements to sell or memoranda of sales or deliveries or transfers of shares or certificates of stock." No attempt appears to have been made under these statutes to impose a tax on loans of stock or returns of borrowed stock. In March, 1915, the Commissioner of Internal Revenue, in response to an inquiry which incorrectly stated that the transfer involved in borrowing and returning borrowed stock " does not represent a change of ownership," made a decision (T. D. 2182) that such transactions were not subject to the tax under the Act of 1914. Neither of these acts contains the words " or transfers of legal title to shares or certificates " which, as we have indicated, are of significance in the Acts of 1917 and 1918 because precisely applicable to the transfers under consideration.

The Act of 1917 became a law on October 3, 1917. On March 23, 1918, the Attorney General rendered an opinion (31 Op. 255) that the transfers of stock involved in loans of stock and returns of borrowed stock were subject to the tax under the Act. This opinion was adopted by the Treasury Department in its ruling of March 30, 1918. T. D. 2685. When the bill which became the Revenue Act of 1918 was pending, the attention of the Senate Committee on Finance was directed to the opinion of the Attorney General and the ruling of the Treasury Depart-

ment, and it was urged in public hearing (Sept. 11, 1918,) to amend the bill so as to include "mere loans of stock or the returns thereof" within the proviso exempting from the tax, deposits of certificates of stock as collateral security. The recommended change was not adopted. The provision of the Act of 1917 was re-enacted without substantial change and continued on the statute books until the adoption of the Revenue Act of November 23, 1921, (c. 136, 42 Stat. 227), when the proposed change was incorporated in it (Title XI, Schedule A, par. 3, 42 Stat. 304).

We can find in this history no substantial basis for the contention that there was a legislative adoption of any settled administrative construction of the statute adverse to the position now taken by the Government. On the contrary, the enactment of the Revenue Act of 1918 without material change of the provision in question must, we think, be taken as indicating a purpose to continue in force the existing law as interpreted by the Attorney General (*United States* v. *G. Falk & Bro.*, 204 U. S. 143); and when Congress adopted in the amended law of 1921 the very suggestion made and rejected two years before, it then intended to effect a change in the law as it had previously existed. *Smietanka* v. *First Trust & Savings Bank*, 257 U. S. 602.

Nor are we able to find in the statute any expression of a general purpose to exclude from the application of its express language the type of transactions now under consideration. It evidenced a purpose not only to tax all sales or agreements to sell which had been previously taxed, but to extend the taxing provision to all transfers of legal title to shares or certificates whether technical sales or not. It was not suggested at the argument that other forms of transfer, not sales and not expressly excepted from the operation of the Act by this proviso, such as gifts or transfers in trust for the benefit of the trans-

ferror, were not subject to the tax; and the Department has consistently ruled that they were. See T. D. Regulations 40.

As already indicated, the borrowing of stock and the returning of borrowed stock do not fall within the description of those classes of transactions expressly exempted from the tax. Nor do they so resemble them in a popular and non-technical sense as to warrant their inclusion among the exceptions. Even in a loose and colloquial sense it cannot be said that the loan of stock is a "deposit of stock certificates as collateral security for money loaned thereon." We therefore conclude that while there is no indication of a purpose to impose a discriminatory tax upon short sales or transactions necessarily involved in short sales, there was a general purpose to tax all transfers of legal ownership of shares of stock which includes those made necessary in order to complete a short sale. It follows that they are subject to the tax imposed upon the class of transactions in which they are included.

*Judgment affirmed.*