Booth, Chief Justice,
delivered the opinion of the court: The plaintiff, a New Jersey corporation, manufactures and sells toilet and laundry products, such as soaps, wash *515 ing powders, etc. In marketing its various products the corporation, in or about the year 1890, established the system of issuing coupons to consumers of its laundry products, exchangeable for certain articles of jewelry listed in its catalogue.
On each wrapper or container of its laundry soaps and powders a place was reserved for printing a coupon. Attention was drawn to the coupon in rather bold-faced type by the following words, appearing upon another portion of the wrapper or container, viz, “ Save the coupon on the other side of the package.” Extending along the narrow sides of the wrapper or container, in conspicuous type, appeared an engaging solicitation to save the coupons and directions as to how to procure premiums. When a sufficient number of coupons had been accumulated the holder thereof was entitled to the specific article of merchandise listed in the catalogue as obtainable upon presentation of the requisite number of coupons. A vast number of illustrated catalogues were circulated by the plaintiff among the trade, setting forth with precision the exact number of coupons necessary to obtain a specified article of merchandise. In addition to this the plaintiff maintained during the period involved in this litigation approximately 50 separate stores, each employing two clerks, at an annual expense of $3,000, where coupons could be presented in exchange for premiums, as stated in the catalogues. Twenty trucks owned and operated by the plaintiff supplemented the above method of redeeming coupons. Some of these trucks traversed the streets of certain cities, while others extended their tour into the country districts redeeming coupons as per cata-logues.
This special feature of the plaintiff’s business activities attained vast proportions. In a period of four years — i. e., from 1920 to 1924, inclusive — the plaintiff redeemed over 920,000,000 coupons, having concededly issued millions which had not been presented for redemption.
The plaintiff admits that approximately 25% of all the merchandise catalogued as premiums during the period covered by this controversy consisted of articles of jewelry. *516 It is manifestly a fact, not disputable, for the catalogues confirm the admission both by illustration and description.
Section 905 of the revenue act of 1918, 40 Stat. c. 18, p. 1051, is as follows:
“ Sec. 905. That on and after April 1, 1919, there shall be levied, assessed, collected, and paid (in lieu of the tax imposed by subdivision (e) of section 600 of the revenue act of 1917) upon all articles commonly or commercially known as jewelry, whether real or imitation; pearls, precious and semiprecious stones, and imitations thereof; articles made of, or ornamented, mounted, or fitted with, precious metals or imitations thereof or ivory (not including surgical instruments) ; watches; clocks; opera glasses; lorgnettes; marine glasses; field glasses; and binoculars; upon any of the above when sold by or for a dealer or his estate for con-éymvption or use, a tax equivalent to 5 per centum of the price for which so sol'd.”
On May 2, 1919, the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, issued the following regulation:
“ The giving of so-called ‘ premiums ’ in return for wrappers, labels, coupons, trading stamps, or other scrip, delivered or sold in connection with the sale of a commodity, is a sale within the meaning of section 902 and section 905 if the premium is within the class of articles enumerated in those sections. In such cases, the tax attaches at the time title in the premium passes to the person receiving it in exchange for such scrip, and is to be computed on the fair market value of the premium at such time.”
On July 17, 1919, the above regulation was amended by the addition of the following words:
“ No tax attaches to the gift of an article which if sold would be taxable. Premiums given in return for wrappers, labels, coupons, trading stamps, or other scrip are not considered as gifts.”
The revenue act of 1921, section 905 (a) (42 Stat. c. 136, p. 227), contained the excise tax by the following provisions:
“Sec. 905. (a) That on and after January 1, 1922, there shall be levied, assessed, collected, and paid (in lieu of the tax imposed by section 905 of the revenue act of 1918) upon all articles commonly or commercially known as jewelry, *517 whether real or imitation; pearls, precious and semiprecious stones, and imitations thereof; articles made of, or ornamented, mounted, or fitted with, precious metals or imitations thereof or ivory (not including surgical instruments, eyeglasses, and spectacles); watches; clocks; opera glasses; lorgnettes; marine glasses; field glasses; and binoculars; upon any of the above when sold by or for a dealer or his estate for consumption or use, a tax equivalent to 5 per centum of the price for which so sold.”
Following the quoted statute's, and in pursuance of the adopted regulations continued in force during the existence of the revenue law, the commissioner levied, assessed, and collected between December 27, 1920, and July 23, 1924, from the plaintiff excise taxes to the amount of $16,944.22, classifying plaintiff as a dealer in jewelry. A claim for refund was seasonably filed, subsequently refused, and this suit is for the recovery of the above amount, predicated upon an alleged illegal exaction under the applicable statutes.
It is first insisted that section 905 of the revenue act as originally enacted and subsequently reenacted, with modifications, was clearly intended as an excise tax upon regular and established dealers in jewelry, and was not designed to reach an enterprise solely incidental to the substantial purpose and real business of the corporation involved. The original purpose of Congress in imposing this so-called luxury tax, as clearly deducible from the act of 1917, was to tax the jewelry industry at the source. The tax by this legislation was imposed upon the manufacturer, producer, or importer. The act of 1918 reverses this legislative policy and the tax is laid upon one whose principal business is the sale of such articles for consumption or use. As aptly observed by the plaintiff, the effect of this legislation was to transfer the tax directly to the consumer and limit the imposition to regular dealers. The act of 1921 emphasizes the legislative intent as to this particular insistence by inserting the words “ when sold by or for a dealer or his estate for consumption or use.” The progress of the various acts through Congress confirms the contention of the plaintiff, to the extent at least of sustaining the assertion that “ dealers ” in jewelry were *518 to be reached. Notwithstanding the apparent positiveness of the designed purpose and extent of the tax, the question leaves open for decision the real critical issue in the case, i. e., is the plaintiff a regular dealer or a dealer in jewelry within the terms of the act. The act itself is not ambiguous. The court need not resort to rules of construction to ascertain its meaning or scope. The issue involved is obviously one as to whether under the facts developed the plaintiff comes within its terms and is thus subject to the tax.
There is nothing mysterious or particularly obscure in the term “ dealer ” or “ regular dealer.” Congress did not employ the term in any restricted, narrow, technical sense. Kevenue was to be exacted from a business enterprise where jewelry was sold. Congress did not intend to burden an incidental sale or inconsequential incomes from sales, even though the article of merchandise was regarded as a luxury. Surely a business enterprise may not escape the tax because perchance it holds itself out to the world as primarily engaged in the manufacture and sale of soap, when at the same time it purchases and transfers to its ultimate consumers a class of merchandise costing vast sums to accumulate and equally large sums to distribute. If this is so, it would be difficult, indeed, to reach any mercantile establishment dealing in numerous commodities but specializing in a single one. There is no insurmountable obstacle in the way of classifying a business upon the basis of two attainable objectives, both of which are sufficient in extent to come within the meaning of the word “ dealer.” We can not doubt that ancillary enterprises, inseparably linked with the principal object of inducing returns upon what the owners and operators of a large corporation designate their principal business, may become so closely merged that it is difficult to segregate one from the other. This case, it seems to us, demonstrates the fact. Within a period of four years over nine hundred million coupons are issued, each of which has an intrinsic monetary value, obligating the corporation to purchase and maintain available articles of jewelry at the cost at least of $338,884.40; entering into innumerable contracts to exchange *519 one for the other, and maintaining at great expense a segregated organization to care for and administer the enterprise. If this does not constitute the plaintiff a dealer in jewelry, and one, if not the principal, activity in the sale of its merchandise, it is indeed difficult to define the term. Catalogues by the thousands were freely circulated throughout the desired territory of the trade, in each of which there were conspicuously displayed by attractive illustrations and descriptions innumerable articles of jewelry, ranging in value from insignificant sums to real and valuable gold and silverware, that a consumer was entitled to claim upon presentation of the requisite number of coupons. It is common knowledge, universal experience, that jewelry is the most enticing form of premium. The supposed acquisition of an article of luxury by a consumer upon the erroneous impression that he acquires something for nothing is the fundamental reason for the wide expansion of the system.
An argument is advanced that the receipt of a legal consideration for the premium jewelry articles did not of itself render them taxable, that the giving of coupons to be exchanged for jewelry is not a sale within the meaning of the revenue act. The statement of the first proposition removes the possibility of characterizing the transaction as a gift. If the second one is to be conceded, there is but one other source of refuge, unless it may be possible to isolate the transaction and attach to it a hybrid classification partaking of the characteristics of neither a sale, exchange, nor gift. A review of the State cases indicates a contrariety of opinion upon this very subject. In every instance when the above controversy has come before the State courts, the contention of the proponents of the system has consistently been that the transaction is not a gift nor a sale, but an item of overhead expenses allottable to the advertising budget. The cases are far too numerous to cite, and have uniformly arisen through some form of State legislation directed toward the restriction or prohibition of the system. The plaintiff in its brief cites the following typical cases: Hewin v. Atlanta, 121 Ga. 723; O’Keefe v. Sommerville, 190 Mass. 110; Ex Parte McKenna, 126 Cal. 429; State v. Dalton, 22 R. I. 77.
*520 On the other hand, it is not difficult to find an array of eminent State authorities sustaining the contention of the defendant that the transaction is a sale. In Commonwealth v. Emerson, 165 Mass. 146, the supreme court of the Commonwealth relieved a dealer accused under a prohibitive statute forbidding the giving of prizes or gifts as an inducement for the sale of an article of merchandise by holding a transaction substantially similar to the one in suit to be a sale and not a gift. The opinion of the court uses this significant language:
“ We must give these words a reasonable meaning. They were not intended and do not purport to forbid a sale of two things at once, even if one of them is the principal object of desire and the other an additional inducement which turns the scale.”
See also Commonwealth v. Sisson, 178 Mass. 578; Merchants Legal Stamp Co. v. Murphy, 220 Mass. 281.
The court in deciding the case of Sperry & Hutchinson v. Hertzberg, 69 N. J. E. 264, characterized a premium transaction which in our opinion applies with especial force to the one in suit. The court said:
“ I think it is very important to the comprehension of this case to perceive at the start that, while the trading stamp is of no value whatever, and evidences no right of redemption until it ‘ has been issued in the regular way,’ by a subscriber of the complainant to his cash customers, and therefore necessarily has been £ collected in the regular way ’ by such customer, after such issuance and collection it represents a property right of quite definite pecuniary value, which the complainant has most distinctly and intentionally made generally transferable. This property right is bought and paid for by the collector. The stamp is practically a negotiable order for merchandise. It is a mistake to regard it as a gratuity. Shoppers are invited to buy merchandise for cash from the complainant’s subscribers because for their money they get cei’tain articles which the subscribers purvey, and also the right to select and receive certain other articles which the complainant purveys. Under this trading scheme $100 buys goods of that price or value from the merchant and goods or the value of $3, $4, or $5 from the complainant.”
See also Benbow-Brammer Co. v. Heffron-Tanner Co., 144 Fed. 429-431.
*521 Without burdening this opinion with additional citations of decided cases, many available to the same effect, we deem it sufficient to close this point of the discussion by referring to what was said by the Supreme Court in the case of Rast v. Van Deman & Lewis Co., 240 U. S. 342. Here the Supreme Court had before it the constitutionality of State legislation subjecting premium-giving merchants to a special tax. In the course of the opinion, and decisive of a contention that profit-sharing coupons and trading stamps were in legal effect no more than a process of advertising, the court said:
“ It would be an endless task to cite cases in demonstration [of lawful restrictions upon liberty of contract and business], and that the supplementing of the sale of one article by a token given and to be redeemed in some other article has accompaniments and effects beyond mere advertising the allegations of the bill and the argument of counsel establish. Advertising is merely identification and description, apprising of quality and place. It has no other object •than to draw attention to the article to be sold, and the acquisition of the article to be sold constitutes the only inducement to its purchase. * * * The schemes of complainants have no such directness and effect. They rely upon something else than the article sold. They tempt by a promise of a value greater than that article and apparently not represented in its price.”
The plaintiff contends that the method employed by it in the redemption of coupons and distribution of premiums completely removes the transaction from the operation of the taxing law and from the conclusive effect of the precedents last cited. To sustain this contention emphasis is laid upon a claimed distinction between a direct transaction between the dealer and the coupon recipient and one, as in this case, where the merchandise is sold directly to the con, sumer by the retailer and the coupons redeemed by the plaintiff, the wholesaler. By this method a claim is made that the premium articles were not sold by the plaintiff, and the taxing act clearly contemplates reaching only “ actual sales.” The argument is not impressive. The statute lays the tax upon the articles “ when sold by or for a dealer or his estate.” It is apparently unimportant, so far as the statute is concerned, whether the dealer himself sells the *522 articles directly or engages through another to complete transactions the dealer expressly authorizes him to complete. The plaintiff earnestly urges that—
“ The sole legal consideration passing to claimant from the persons purchasing its wares from the corner groceryman. or other retail dealers therein' — was not the payment to it of any money whatsoever. On the contrary, it was the payment of money to a distinct stranger or third, party. * * * Certainly neither claimant nor the ultimate consumers of its wares had the slightest intention, on the one hand, of selling, or, on the other, of bwying, in the ordinary sense of these terms, premium jewelry articles merely exchanged for claimant’s coupons without any payment of money to it whatsoever.”
The argument quoted applies to a gift, and the plaintiff frankly admits that the premiums are not gifts. The record discloses and the findings exhibit that the cost of premiums involved and the overhead expense of administering the system are included in the selling price of the laundry products, and the retailer who distributes the product pays the same. So that in its final analysis the consumer receives from the wholesaler a small or large discount, according to the extent of his purchases, upon the purchase price of the wholesaler’s products paid to the retailer, and the retailer derives the valuable consideration which this offer of discounts attracts in the way of added customers and a larger volume of sales. In plain words, the plaintiff says to the consuming public: If you will buy my laundry products from the corner groceryman, I will pass title to you to more than a cake of soap or a package of powdered soap. I will enhance the value of your purchase by adding thereto in proportion to the quantity you purchase such articles of merchandise as the amount of your purchase warrants, and agree that when my agent, the corner groceryman, makes the sale, he will deliver to you a due bill upon me, which I promise to honor in payment. The groceryman by this transaction pays to the wholesaler more for the soap than he would pay without it, and passes the added cost on to the consumer. Is there any possible doubt as to who in the end receives consideration for the premiums transferred ? *523 As a matter of fact, the wholesaler receives the consideration for the premiums to be distributed in advance of their distribution, and if losses occur the retailer suffers, unless duly compensated by the increased volume of business induced by the establishment of the premium system.
Many other arguments are persistently and ably set forth in plaintiff’s briefs, pointing out the inapplicability of the taxing law. They have not escaped attention nor careful consideration, notwithstanding the lack of comment with reference thereto. We can not escape the conclusion that where one engages in a business, vast in extent, involving a separate and distinct organization, incurring great annual expense and advertising the enterprise extensively and continuously, such a one is a dealer in the commodities disposed of. In our view of the case, there must of necessity exist thousands of small dealers in jewelry in the country, not even approaching the magnitude of the plaintiff’s jewelry transactions, and with whom the plaintiff came into actual and effective competition, who have had to pay the tax mentioned in the revenue act.
We are unable to abstract from the arguments put forth to escape the tax wherein the plaintiff essentially differentiates its jewelry business from the ordinary and customary method of sales over the counter for cash or on credit by simply departing therefrom to the extent of recognizing an obligation to transfer title to an article of jewelry kept on hand, upon the presentation of coupons previously issued to the purchaser for a valuable consideration; and this conclusion is not affected by the fact that upon sporadic occasions for the establishment and promotion of plaintiff’s business it sometimes disposed of its products for less than its usual wholesale price and perhaps at a loss. Obviously such a campaign was temporary in character and duly compensated for within a reasonable time or permanently discontinued. At any rate, there Is nothing in the record to indicate that it in any way retarded the development of the coupon system or converted the exchange of coupons for jewelry into an adopted system of giving the premium jewelry away. On the contrary, the evidence establishes that the coupons issued possessed a sufficient monetary value; *524 that despite the expressed terms upon, which they were issued, forbidding their transfer, they fell in large numbers into the hands of brokers, buying up the same, a practice which cost the plaintiff both time and money to in part forestall.
A final impediment to the collection of the tax is said by the plaintiff to reside in the fact that the pnce for which the articles of jewelry are exchanged for coupons is not ascertainable, and hence the regulations for the collection of thé tax are contrary to the wording and intent of the law. To so contend is the equivalent of asserting that if a dealer in jewelry establishes a method of selling his merchandise, which method obscures the ready ascertainment of the selling price of the article sold, he may escape the revenue laws and carry on free from this burden. In other words, he may indirectly accomplish a result which he may not directly do. The statute uses the' words “ a tax equivalent to 5 per centum of the price for which so sold.” Manifestly, the commissioner in the administration of the revenue laws is not bound to accept the return of the dealer as to price. Investigations and audit may be made of the dealer’s transactions to ascertain the verity of the returns, or reasonable regulations, lawful, of course, and conducive to the correct administration of the law, may be promulgated. Tested by the commissioner’s authority and the extent of his power under the statute, we are unable to find the difficulties which the plaintiff so vigorously protests as present. The plaintiff, in fixing the value of jewelry premiums, predicates their acquisition upon a sufficient number of redeemed coupons to cover not only the market value of the article transferred, but adds thereto the proportionate cost of overhead incurred in the conduct of the business, and thereby really obtains an estimated price somewhat in excess of the market value of the jewelry. The price thus fixed by the plaintiff embraces within its computation elements of uncertainty and estimates, and may or may not reflect stable and precise return for the articles sold. The commissioner, on the other hand, resorts to a basis easily ascertainable and obviously to the advantage of the taxpayer in that estimates and pro rata apportionments of overhead, etc., are absent.
*525 We have not overlooked the principles of statutory construction applied to taxing acts by the Supreme Court in the Gould case, 245 U. S. 151; or the Merriam case, 263 U. S. 179. The distinction we observe between this case and those adjudicated in the above-cited cases lies in the fact that the record in this case clearly proves the existence of a sale “ price ” within the statute, and the court is not at liberty to overlook decisive precedents which impose upon a litigant seeking exemption from the payment of a tax the burden of clearly proving his right to the same. Cornell v. Coyne, 192 U. S. 418, 431. The commissioner promulgated the regulations challenged as a reasonable method of ascertaining the tax, wherein the statute measures it by the price received, under the revenue acts of 1918,' 1921, and 1924. The luxury tax on jewelry sales continued as expressed in the foregoing statutes until omitted from the revenue act of 1926. Treasury decisions have repeatedly construed the regulations, and Congress, fully aware of this settled construction of the law by the commissioner, reenacted without material change the section, involved, thereby giving to the regulations the weight of its approval. Provost v. United 269 U. S. 443.
The petition will be dismissed. It is so ordered.
SiNNOtt, Judge; GreeN, Judge; Moss, Judge; and GRaham, Judge, concur..