## UNITED STATES v. UHLMANN GRAIN CO.
### No. 5566.

Circuit Court of Appeals, Seventh Circuit.
June 18, 1936.

Frank J. Wideman, Asst. Atty. Gen., Sewall Key, Andrew D. Sharpe, and E. F. McMahon, Sp. Assts. to the Atty. Gen., and Michael L. Igoe, U. S. Atty. of Chicago, Ill., for the United States.

902

James J. Coughlin and Walter F. Cunningham, both of Chicago, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

The government appeals from a judgment ordering the refund to the taxpayer of certain sums paid under protest upon assessment for stamp taxes. It raises the question of whether or not certain transactions known in the parlance of the Board of Trade as "accommodation trades" or "position loans" are sales, agreements of sale, or agreements to sell, and as such, subject to the excise tax levied under section 800, et seq., Schedule A(4) of the Revenue Act of 1926, 44 Stat. 101, 26 U.S. C.A. § 901 (4), now 26 U.S.C.A. §§ 903, 921(b) (2), and § 900 note.[1]

There is no dispute as to the facts which were shown by stipulation, by a series of exhibits, and by the testimony of one witness, but the parties do dispute the conclusion to be drawn from those facts. Appellant contends that they prove a series of sales, agreements of sale, or agreements to sell grain for future delivery; appellee contends that they conclusively prove no such sale or agreement.

With the exception of sales by the actual producers of the grain, all sales for future delivery of grain in the Chicago market are conducted through the clearing house of the Board of Trade. For the purpose of keeping the records of all such sales, an elaborate system of bookkeeping has been devised whereby the position of each trader is shown on each day. Under the rules of the clearing house, every contract must be cleared through it, and upon such clearing, the clearing house becomes substituted for the buying and selling parties, and entitled to all the rights and subject to all the liabilities of each with respect to the particular contract. (It will be noted that the transfer of the contract involved in this substitution is specifically exempted by the statute from the incidence of the tax.) The clearing house requires a daily settlement of all open accounts, and in addition, a graduated scale of margin deposits in order to protect itself from loss in case of failure or forced liquidation which might result in flooding the market with the particular commodity thereby causing violent fluctuations in the

---

[1] "Sales on exchange for future delivery.

"Upon each sale, agreement of sale, or agreement to sell (not including so-called transferred or scratch sales), any products or merchandise at, or under the rules or usages of, any exchange, or board of trade, or other similar place, for future delivery, for each $100 in value of the merchandise covered by said sale * * * 1 cent, and for each additional $100 or fractional part thereof in excess of $100, 1 cent: Provided, That on every sale * * * there shall be made and delivered by the seller to the buyer a bill, memorandum, agreement, or other evidence of such sale. * * * to which there shall be affixed a lawful stamp or stamps in value equal to the amount of the tax on such sale: Provided further, That sellers of commodities described herein, having paid the tax provided by this subdivision, may transfer such contracts to a clearing-house corporation or association, and such transfer shall not be deemed to be a sale * * * within the provisions of this Act [chapter]: Provided, That such transfer shall not vest any beneficial interest in such clearing-house association but shall be made for the sole purpose of enabling such clearing-house association to adjust and balance the accounts of the members of such clearing-house association on their several contracts. Every such bill, memorandum, or other evidence of sale * * * shall show the date thereof, the name of the seller, the amount of the sale, and the matter or thing to which it refers; and any person liable to pay the tax as herein provided, or any one who acts in the matter as agent or broker for such person, who makes any such sale * * * or who, in pursuance of any such sale * * * delivers any such products or merchandise without a bill, memorandum, or other evidence thereof as herein required, or who delivers such bill, memorandum, or other evidence of sale * * * without having the proper stamps affixed thereto, with intent to evade the foregoing provisions, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not exceeding $1,000 or be imprisoned not more than six months, or both.

"No bill, memorandum, agreement, or other evidence of such sale * * * in case of cash sales of products or merchandise for immediate or prompt delivery which in good faith are actually intended to be delivered shall be subject to this tax."

price of the commodity. Under this margin rule, a trader who carried contracts for short sales of 10,000,000 bushels of a grain would be required to make a deposit with the clearing house at a higher rate than one who carried similar contracts for 2,000,000 bushels. To avoid this requirement, trading members have devised a system of so-called accommodation trades or position loans. Thus, a member having a short position of, say, 2,000,000 bushels, will accommodate a member having a short position of 10,000,000, by permitting the latter to transfer temporarily to him part of his contracts, with the understanding that the transferor is to retain all the benefits or burdens of the contracts which are to be transferred back to the original contracting party upon demand of either party to the accommodation trade. The margin deposits are to be supplied by the original party, so that the other in no way changes its status except for one very important feature, namely, in case of default of the party accommodated, the party accommodating must assume the liability of the contract. In other words, in lending its position to the original party, both contemplate that the transaction is a purely nominal one, and that the lender will be called upon for nothing, and that when the time comes for performance, the original party will resume its position under the contract and perform it. If, in the meantime, it becomes impossible for it to perform, the lender is obligated to the clearing house to do so, in spite of the original intention of both parties.

The taxes which appellee was permitted by the District Court to recover arose out of a number of transactions. Since they all involve similar facts and identical principles, we examine only one of them. On March 11, 1929, appellee was short 15,000,000 bushels of wheat, for the top 2,000,000 of which it was required to maintain a deposit of seven and a half cents a bushel. On the same day, the Continental Grain Company was short only 3,000,000 bushels. It was required to maintain a deposit of only three cents a bushel on all contracts up to 5,000,000. As an accommodation, therefore, it took over contracts for 2,000,000 bushels, thereby enabling the appellee to withdraw $150,000 from deposit on its own account, $60,000 of which it thereupon deposited for the Continental for the contracts the latter assumed. The contracts were turned back on April 22, 1929. All parties agree that the sole purpose of the transfer of the contracts was to enable appellee to avoid the requirement of the larger margin rate. The transaction was brought about by means of a telephone communication or an office meeting, rather than in the wheat pit, as required by Board of Trade rules for regular contracts of purchase or sale. The loan and the return of the position were reported respectively by appellee and the Continental Company as accommodation trades to the Grain Futures Administration of the Department of Agriculture in the daily reports which were required by law to be made to that Department.

In support of its contention that the acts here involved constituted no sale, agreement of sale or agreement to sell, appellee submitted as exhibits a series of specimen records of the two types of transactions, the regular sale, and the accommodation trade. It is unnecessary for us to describe these exhibits, except to say that they indicate that there is a substantial difference between the records of an actual, completed sale which all parties agree is subject to the tax, and those of such a transaction as is here sought to be taxed, although both show up on the final records of the clearing house as sales. Appellant argues that because the transfer is recorded by the clearing house as a sale, with no indication on its records of its accommodation character, and because the Board of Trade will recognize such transfer only on the basis of the assumption by the accommodating party of liability to fulfill the contract in case of default by the accommodated one, it must be considered a sale, agreement of sale or agreement to sell, subject to the tax. It apparently considers immaterial the fact that the transaction was brought about by the irregular method of an office or telephone communication, rather than in the pit. It argues that the government should be able to tax transactions according to the official records of the clearing house without having to refer to private agreements which negative their effect, or having to inspect subordinate records in order to determine how the transaction took place.

Appellant has cited two cases which involve situations somewhat analogous to the one at bar. In the first, Provost v. United States, 269 U.S. 443, 46 S.Ct. 152, 70 L. Ed. 352, a tax was upheld on a stock loan

incidental to a short sale. The situation was similar to the one here involved in that no profit or loss was to accrue to the borrowing broker who deposited the full value of the stock with the lender to be held by him until delivery of *similar* stock upon demand of either party. The court held that four completed transfers took place during the course of this transaction, in each of which title passed completely. It is to be noted that the completion of the transaction lay in the delivery to the lender of *similar* stock, not the *same* stock, because the latter had to be used in executing the short sale for which it had been borrowed. We think that the distinction between the two situations lies in this fact, that four complete transfers of title took place in the Provost Case, and that it was different stock which was used to complete the steps involved in the loan. In the case at bar, however, while the agreement of sale is temporarily carried by the accommodating party, it is that same agreement of sale which is ultimately returned to the original party to be executed by him. It is the *position* of the accommodating party which the other borrows, for the sole purpose of avoiding the much larger margin obligations which its own position entailed upon it.

Appellant has also called our attention to a decision of the Circuit Court of Appeals for the Second Circuit, announced June 1, 1936. Du Pont et al. v. United States, 83 F.(2d) 951, reported in C. C. H. Federal Tax Service, par. 9330. This case involves a tax levied under the same section of the statute as is here involved. A firm of brokers was instructed by a customer for whose account it had purchased cotton for future delivery to transfer the account to another firm of brokers. This was done by delivering a "sold" memorandum to the other broker, who in turn delivered a "bought" memorandum to the first. No commission was charged on the original transaction. A stamp tax was paid on the transfer to the second broker, and it was this tax which the first broker sued to recover. The Court of Appeals affirmed the decision of the trial court that the transaction was subject to the tax. There is perhaps this distinction between the case considered by that court and the one at bar, that, as in the Provost Case, supra, the New York case involved a final and completed transfer of the agreement of sale or agreement to sell, with both parties intending that the second should perform the contract, while in the case at bar, there was no intention on the part of either party that the second should have anything to perform. The decision of the New York case does not, however, rest on this distinction. Instead, the court there emphasizes the form of the transaction, "Although the purpose of the transaction was to transfer a customer's account from one brokerage firm to another, the mechanics of doing this involved a contract of sale for future delivery made by the plaintiffs with the substitute broker. * * * To call it a transfer of the plaintiffs' contracts to buy is a misnomer resulting from an inaccurate analysis of the legal relations as above explained. No contract to buy was assigned; no title to specific cotton was transferred, and the new broker's contract did not require delivery by the plaintiffs of the same cotton they had contracted to accept from the original sellers; any other cotton of the specified description would satisfy the contract as well." The same might be said as to the transaction here involved, if we chose to be governed by the mechanics rather than the purpose of the transfers. We think, however, that the character of the transaction is not conclusively determined by the nature of the bookkeeping entry used in bringing it about. We agree with the finding of the District Court that the transactions herein described were not sales, agreements of sale, or agreements to sell, hence were not properly taxed as such.

Judgment affirmed.