Halpern, J., concurring in the result only: Putting aside the addition to tax and penalty, we must answer two questions. First, did petitioner dispose of his IBM common stock in 2001 by transferring it to Derivium? Second, if he did, did the transaction nevertheless remain open for income tax purposes until 2004 when petitioner decided whether to demand that Derivium return stock identical to the transferred stock, so as to invoke the nonrecognition rule of section 1036?[1] I answer the first question in the affirmative and the second in the negative, as does the majority; our reasons differ, however, particularly with respect to the first question. Shares of stock of the same class are fungible, and this has given rise to apparently formalistic rules for determining questions of ownership (and, by extension, disposition) of such shares. The traditional, multifactor, economic risk-reward analysis, as argued by the parties, is appropriate for determining tax ownership of nonfungible assets, such as cattle. See Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). For fungible securities, however, a more focused inquiry — whether legal title to the assets and the power to dispose of them are joined in the supposed owner — has been determinative of ownership for more than 100 years. In Richardson v. Shaw, 209 U.S. 365 (1908), a nontax case, a stockbroker, who held title to the securities in a customer’s margin account, had pledged those securities to secure a loan. The broker then filed for bankruptcy. The question before the Court was whether, despite the pledge and the broker’s authority to cover its obligation to its customer with securities other than those actually purchased on the customer’s behalf, the customer was the owner of the securities and so, on the broker’s bankruptcy, did not become merely a creditor of the bankrupt. Focusing on the fungibility of the securities in question and the broker’s limited authority to pledge them (and not to sell them except in limited circumstances), the Court concluded that the broker’s status was essentially that of a pledgee and that the customer was and remained the owner of the securities. Legal title and the power to dispose were not united in the broker, and the broker was not, therefore, the owner of the securities. In Provost v. United States, 269 U.S. 443 (1926), a Federal stamp tax case, the question was whether the transfers of stock back and forth between a securities lender and a securities borrower (both stockbrokers) constituted taxable dispositions of the stock. The Court assumed that such transfers usually occurred to facilitate short sales. The securities lender provided the stock to the securities borrower, who delivered it in fulfillment of the agreement of his customer (who was short the stock) to sell it. The lender had the contractual right, on demand (with notice), to receive equivalent stock from the borrower. The Supreme Court sharply distinguished the facts in Provost from those in Richardson v. Shaw, supra. In Richardson, the broker’s status as pledgee rather than owner rested on the requirement that the broker have on hand for delivery to its customers stock of the kind and amount that the customers owned. In a securities loan, however: The procedure adopted and the obligations incurred in effecting a loan of stock and its delivery upon a short sale neither contemplate nor admit of the retention by * * * the lender of any of the incidents of ownership in the stock loaned. * * * Upon the physical delivery of the certificates of stock by the lender, with the full recognition of the right and authority of the borrower to appropriate them to his short sale contract, and their receipt by the purchaser, all the incidents of ownership in the stock pass to him. [Provost v. United States, supra at 455-456.] Notwithstanding that the securities lender retained full market risk on the stock lent, the loan (and return) of the stock were considered dispositions, shifting ownership of the stock transferred. As one scholar wrote of the Supreme Court’s analysis in Provost: The analysis could not be clearer: a pledgee does not become a tax owner of a pledged stock while a borrower does become a tax owner of a borrowed stock because the pledgee has a limited control over the pledged securities while the stock borrower’s control is complete. This result obtains even though a stock borrower gains no economic exposure to the borrowed stock, all of which is retained by a lender. In other words, control overrides economic exposure in determining tax ownership of a borrowed stock. [Raskolnikov, “Contextual Analysis of Tax Ownership”, 85 B.U. L. Rev. 431, 481-482 (2005); emphasis added.[2]] Derivium was in the position of a securities borrower who borrows stock to deliver on a short sale, and petitioner was in the position of the securities lender who lends his stock to make that delivery possible. It is enough for me that petitioner gave Derivium the right and authority to sell the IBM common stock in question for its own account, which Derivium in fact did.[3] The nonrecourse nature of petitioner’s obligation to repay Derivium, and almost every other factor considered by the majority to determine who bore the “benefits and burdens of ownership”, is beside the point. Petitioner disposed of the stock in 2001. Without more, that would constitute a realization event in that year. See sec. 1001(a). Petitioner correctly makes no claim that section 1058 saves him from recognition of income. See Samueli v. Commissioner, 132 T.C. 37, 49 (2009) (section 1058(b)(3) requires that the lender be able to demand a prompt return of the lent securities). We need only determine whether the calculation of gain or loss must remain open, awaiting the determination of whether petitioner closed the transaction in 2004 by acquiring IBM common stock from Derivium. I think not. Petitioner relies on Rev. Rui. 57-451, 1957-2 C.B. 295, which addresses whether a taxpayer holding stock received pursuant to the exercise of a restricted stock option makes a disqualifying disposition of that stock when he "lends” the stock to a broker in a transaction that would qualify as a disposition under the analysis of Provost v. United States, supra. The ruling concludes that whether there is a disqualifying disposition turns on whether, at the end of the loan transaction, the taxpayer receives from the broker stock that would qualify for nonrecognition of gain or loss under section 1036. The pertinent facts of the ruling are distinguishable from the facts of this case because, in consideration for his stock, the taxpayer in the ruling appears to have received nothing other than “the personal obligation, wholly contractual, of the ‘borrowing’ customer to restore him, on demand, to the economic position in which he would have been as owner of the stock, had the ‘loan’ transaction not been entered into.” Rev. Rul. 57-451, 1957-2 C.B. at 297. Perhaps the Commissioner thought the transaction remained open because of the distinct possibility that, apart from the borrowing , broker’s contractual obligation, the taxpayer would receive only stock that would qualify any gain (or loss) for nonrecognition under section 1036. Cf. Starker v. United States, 602 F.2d 1341, 1355 (9th Cir. 1979) (nonsimultaneous transfer qualifies as like-kind exchange “[e]ven if the contract right includes the possibility of the taxpayer receiving something other than ownership of like-kind property”). The ruling may be of limited significance for another reason, since it addresses a definition of “disposition” limited to purposes of determining whether there has been a disposition of stock received pursuant to a restricted stock option. The rules governing restricted stock options were found in section 421 before its amendment by the Revenue Act of 1964, Pub. L. 88-272, sec. 221, 78 Stat. 63, and subsection (d)(4) thereof defined “disposition” as a sale, exchange, gift, or transfer of legal title but not, among other things, an exchange to which section 1036 applies.[4] The ruling contains insufficient analysis for me to extend it beyond its unique circumstances. I agree with respondent that petitioner realized $103,985 on his disposition of the IBM common stock in 2001. The parties stipulated that the adjusted basis in the stock was $21,171. Respondent determined that petitioner’s realized gain, in 2001, was $72,415, because respondent allowed him to deduct from the amount realized not only his adjusted basis but also $10,399, denominated in respondent’s calculation as “cost of sale”. Respondent further determined that petitioner must recognize that gain (as long-term capital gain) in 2001. I agree that petitioner must recognize his gain in 2001. It seems to me, however, that the “cost of sale”, $10,399, probably represents not a cost of the sale but the nondeductible value of the option that allowed petitioner (if he wished) to buy 990 shares of IBM common stock from Derivium in 2004 for $124,429 plus, perhaps, Derivium’s charge for undertaking the transaction. Wherry, J., agrees with this concurring opinion. Sec. 1036(a) provides: “General Rule. — No gain or loss shall be recognized if common stock in a corporation is exchanged solely for common stock in the same corporation, or if preferred stock in a corporation is exchanged solely for preferred stock in the same corporation.” Professor Raskolnikov builds his analysis on a seminal discussion of the fundamental difference between tax ownership of fungible and nonfungible assets by now Professor Edward Kleinbard. See Kleinbard, “Risky and Riskless Positions in Securities”, 71 Taxes 783 (1993). Apparently, Judge Holmes and I differ on whether petitioner disposed of his stock on Aug. 16, 2001, when Morgan Keegan credited Derivium’s account with the IBM stock petitioner transferred, or on the next day, Aug. 17, 2001, when Derivium sold that stock. Although I have no authority addressing that point, I think that, consistent with Provost v. United States, 269 U.S. 443 (1926), petitioner disposed of the IBM stock on the prior date; i.e., the date he gave Derivium both the right and authority to sell the stock. I do not believe that applying a similar rule to transactions intended to be securitizations constitutes a change in the law, as Judge Holmes believes. Holmes op. note 1. In any event, sec. 1058 establishes a broad safe-harbor to shelter many securitizations. A similar rule can now be found in sec. 424(c)(1)(B). Neither rule mentions transfers of securities for which no gain is recognized pursuant to sec. 1058.